## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| DENNIS THOMPSON, | Civil No. 08-868 (JRT/RLE) |
| Plaintiff, | |
| v. | |
| HIBBING TACONITE HOLDING COMPANY, a Minnesota corporation, CLIFFS MINING COMPANY, a Delaware corporation, ONTARIO HIBBING COMPANY, a Minnesota corporation, and PICKANDS HIBBING CORPORATION, a Minnesota corporation d/b/a Hibbing Taconite Company, | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR REMAND** |
| Defendants. | |

Wayne A. Kenas, **KENAS LAW FIRM, LTD.**, 6617 Warren Avenue, Edina, MN 55439, for plaintiff.

Kenneth A. Kimber and R. Thomas Torgerson, **HANFT FRIDE PA**, Suite 1000, 130 West Superior Street, Duluth, MN 55802-2094, for defendants.

This case arises out of the termination of Dennis Thompson by defendants Hibbing Taconite Holding Company, Cliffs Mining Company, Ontario Hibbing Company, and Pickands Hibbing Corporation (collectively, "Hibbing Taconite").[1] Hibbing Taconite operates a mine in Hibbing, Minnesota, and Thompson was employed by Hibbing Taconite as a truck driver in one of its mining pits. Thompson was

---

[1] The named defendants are a part of an unincorporated joint venture titled "Hibbing Joint Venture."

terminated after allegedly submitting a fake urine sample during a company drug test and

testing positive for methamphetamine use.  After unsuccessfully grieving his termination,

Thompson filed this action in state court.  Thompson brings claims for violations of the

Minnesota Drug and Alcohol Testing in the Workplace Act, invasion of privacy, breach

of contract, defamation, and two violations of Minnesota state laws governing access to

employee records.  Hibbing Taconite removed this case to federal court, alleging that a

number of Thompson's claims are preempted by the Labor Management Relations Act

("LMRA").  Thompson now moves to remand the case to state court.  For the reasons set

forth below, Thompson's motion is denied.


## BACKGROUND

Hibbing Taconite operates a taconite mining operation near Hibbing, Minnesota.

Thompson was employed by Hibbing Taconite as a production off-the-road truck driver

in the mining pit from 1989 until his termination on January 26, 2007.   Hibbing

Taconite's employees, including Thompson, are represented by the United Steelworkers

of America ("Union").

Working conditions at Hibbing Taconite are governed by a collective bargaining

agreement ("CBA") negotiated by Hibbing Taconite and the Union.  The CBA in effect

at all times relevant here was entered into on August 1, 2004.  That CBA includes the

following passage:

> The Company will not require an employee to submit to a test for drug or
> alcohol use in the absence of objective facts that establish reasonable cause
> to believe that the employee is intoxicated or impaired when reporting to or
> while on the job unless such testing is a professionally recommended

element of the employee's rehabilitation program. . . . Any drug testing will
be performed in accordance with Federal and State laws where applicable.

(Kern Aff., Ex. A at 16.)

On April 1, 2005, Hibbing Taconite announced that it was adopting a new drug

policy.  (Kern Aff., Ex. D.)  This policy includes a description of the circumstances

where Hibbing Taconite intended to test its employees.  This description, which appears

to have been taken nearly verbatim from Minnesota's Drug and Alcohol Testing in the

Workplace Act, included the following:

2.      Reasonable Suspicion Testing

The Company may request or require an employee to undergo drug and
alcohol testing if the Company has a reasonable suspicion that the
employee: (1) is under the influence of drugs or alcohol; (2) has violated
the Company's policy prohibiting the use, possession, sale or transfer of
drugs or alcohol while the employee is working or while the employee is on
the Company's premises or operating the Company's vehicle, machinery,
or equipment; (3) has sustained a personal injury or has caused another
employee to sustain a personal injury; or (4) has caused a work-related
accident or was operating or helping to operate machinery, equipment or
other vehicles involved in a work-related accident.

* * *

7.      Refusal to Test and Consequences

A[n] . . . employee has the right to refuse to undergo Company requested or
required drug and alcohol testing.  Refusal shall be considered
insubordination and shall subject . . . an employee to discipline up to and
including discharge.

(Kern Aff., Ex. E at 6-7.)

This new policy was adopted without the consent of the Union.  The Union

responded by filing a grievance, arguing that Hibbing Taconite had unilaterally amended

the CBA by expanding the circumstances in which it would test its employees.  (Kern Aff., Ex. E at 8.)  The arbitrator agreed, holding that the "reasonable cause" standard set forth in the CBA was still the governing standard, and that anything in the new policy that departed from that standard was unenforceable.  The arbitrator identified several specific circumstances outlined in the policy that would not satisfy the CBA's reasonable cause standard, and Hibbing Taconite later amended its policy accordingly.  (Kern Aff., Ex. F.)

On December 25, 2006, Thompson was operating a truck at the mine.  At some point during his shift, several co-workers outside of the truck were unable to get his attention.  Thompson's co-workers continued to try to get his attention, and an eight-minute period ensued when he was unresponsive to text messages, radio calls, and horn blasts.  Hibbing Taconite concluded that it had reasonable suspicion of drug use based on Thompson's non-responsiveness, and asked him to submit to testing.  Thompson signed a consent form agreeing to the test, took the test, and was placed on administrative leave pending the results.

On January 3, 2007, Hibbing Taconite informed Thompson that the test administered on December 25 was positive for methamphetamine.  Hibbing Taconite suspended him for five days and scheduled a pre-suspension hearing for the same day. Thompson appeared at the hearing with Union representation, and indicated a desire to return to work once the suspension was complete.  Thompson indicates that Hibbing Taconite responded by requiring him to sign a "Last Chance Agreement," which included several conditions Thompson needed to meet in order to retain his job.  Those conditions

included a chemical use evaluation, and a requirement that he provide a negative urinalysis screen before returning to work.

Thompson indicates that at the hearing he was directed to see a psychologist at Fairview that day, and that he was "repeatedly instructed" to take his return-to-work test in the next week.   Thompson reported for the test on January 10, and signed a form acknowledging he would be fired if he submitted a false urine sample.   Nonetheless, Thompson submitted a urine sample that the Medical Center recognized as unusually cold and was later determined to be false.   Approximately two hours after submitting the false sample, Thompson was asked for another sample, which a medical center employee watched him produce.   This second sample tested positive for methamphetamine. Hibbing Taconite contends that if the Medical Center had not caught the fake sample, Thompson would have been released to drive the production truck in the mine with methamphetamine in his system.   On January 11, 2007, Thompson checked into an inpatient program for substance abuse.

On January 22, while Thompson was still in treatment, Hibbing Taconite and the Union conducted a pre-suspension hearing concerning Thompson's most recent incident. The Union made no challenge to the finding that Thompson had submitted a false urine sample.   On January 25, Hibbing Taconite placed Thompson on a five-day suspension for violating the company's drug policy and for submitting the false urine sample.   The following day, Hibbing Taconite converted the five-day suspension to discharge effective immediately.

After unsuccessfully grieving his termination, Thompson filed this action in state court on March 6, 2008.  Thompson included the following six claims:  (1) Thompson alleges that Hibbing Taconite violated the Minnesota Drug and Alcohol Testing in the Workplace Act, s*ee* Minn. Stat. §§ 181.950-181.957, and Hibbing Taconite's own drug testing policies by (a) requiring him to take a drug test without reasonable suspicion, (b) requiring him to sign an improper Last Chance Agreement, (c) requiring him to take a return to duty test, (d) terminating him without giving him an opportunity to participate in rehabilitation, (e) failing to give him a proper acknowledgment form to sign before any drug testing, (f) subjecting him to a breath test, and (g) improperly collecting and testing his "specimens;" (2) Thompson alleges that the conduct described under Count I also constitutes common law invasion of privacy; (3) Thompson alleges that Hibbing Taconite's alleged violations of its own testing policies constitute a breach of contract; (4) Thompson alleges that Hibbing Taconite gave him defamatory reasons for his firing, and that he was therefore forced to re-publish this defamatory material to later prospective employers; (5) Thompson alleges that Hibbing Taconite violated a Minnesota state law requiring the production of employee assistance records upon his request, *see* Minn. Stat. § 181.980; and (6) Thompson alleges that Hibbing Taconite violated a Minnesota state law requiring it to honor his request to review his personnel records, *see* Minn. Stat. § 181.961.

On March 26, 2008, Hibbing Taconite removed this case to federal court, arguing that Thompson's first four claims are preempted by the Labor Management Relations Act ("LMRA") because they are interwoven with the terms of the CBA.  Thompson now

moves to remand the case to state court, arguing that his claims are not preempted because they rely entirely on state law.

## ANALYSIS

### I.      STANDARD OF REVIEW

As the party opposing remand, Hibbing Taconite has the burden of establishing federal subject matter jurisdiction. *In re Bus. Men's Assurance Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993). The Court is required to resolve all doubts about federal jurisdiction in favor of remand. *Id.* However, a district court has no discretion to remand a claim that states a federal question. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996).

### II.     LMRA PREEMPTION

As a general rule, a plaintiff can avoid removal to federal court by alleging only state law claims. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In addition, a defense arising under federal law, including the defense that one or more claims are preempted by federal law, generally does not give the defendant the right to remove to federal court. *Id.* at 392-93. However, "complete preemption" provides an exception to this rule, and is different from preemption used only as a defense. "Complete preemption can arise when Congress intends that a federal statute preempt a field of law so completely that state law claims are considered to be converted into federal causes of action." *Gaming Corp.*, 88 F.3d at 543. "Only those claims that fall within the preemptive scope of the particular statute . . . are considered to make out federal

- 7 -

questions, but the presence of even one federal claim gives the defendant the right to remove the entire case to federal court." *Id*. (citation omitted).

The "complete preemption" doctrine has been consistently applied in the context of claims brought under the LMRA. *See Chapman v. Lab One*, 390 F.3d 620, 629 (8th Cir. 2004). The LMRA grants federal courts jurisdiction over "suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). The Supreme Court has interpreted the LMRA as preempting state-law claims in situations where the resolution of that claim substantially depends upon interpreting the terms of the collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988). If the state-law claim is founded directly on rights created by the labor contract, or is "inextricably intertwined with consideration of the terms of the labor contract," the state-law claim is preempted. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985). "Such claims must be resolved through the grievance and arbitration procedures contained in the [CBA] or brought under . . . the [LMRA]." *Nanstad v. N. States Power Co.*, No. 06-3087, 2007 WL 474966, at *3 (D. Minn. Feb. 9, 2007). "Defenses, as well as claims, must be considered in determining whether resolution of the state-law claim requires construing the labor contract." *Id*.

A claim is not preempted under the LMRA, however, if its resolution does not require "interpretation" of the CBA. *St. John v. Int'l Ass'n of Machinists & Aerospace Workers*, 139 F.3d 1214, 1217 (8th Cir. 1998). "In other words, a claim is not preempted simply because it requires reference to the [CBA]." *Nanstad*, 2007 WL 474966, at *3. In

addition, a claim is not preempted where an employee invokes "nonnegotiable state-law rights . . . independent of any right established by contract." *Allis-Chalmers Corp.*, 471 U.S. at 213.

## III.   THOMPSON'S CLAIMS

### A.   Count I

In Count I of his complaint, Thompson alleges that Hibbing Taconite committed multiple violations of Minnesota's Drug and Alcohol Testing in the Workplace Act ("DATWA").  *See* Minn. Stat. §§ 181.950-181.957.  Allegations that Hibbing Taconite violated such non-negotiable state law rights do not require an interpretation of the CBA, and would not be preempted under the LMRA.  *See Lingle*, 486 U.S. at 411-12. However, Count I also includes the following allegation:

> 65.    On or about December 25, 2006, Defendant failed to follow its procedures relating to determination of reasonable suspicion necessary to subject employees to drug and alcohol testing.

This allegation is followed by four additional allegations that Hibbing Taconite violated its own "testing policy."  (*See* Complaint ¶¶ 67, 68, 69, 78.)  Whether Hibbing Taconite violated its own testing policies is a separate question from whether it satisfied the requirements set forth in DATWA, and requires interpretation of the CBA.

Thompson argues that this claim is nonetheless not preempted, because the testing policies he is referring to are the ones that Hibbing Taconite unilaterally implemented in April 2005.  Thompson characterizes that policy as separate and distinct from the CBA, and therefore outside of the scope of the LMRA.  However, as set forth above, an

arbitrator concluded that any rights and responsibilities undertaken in those policies are ultimately grounded in the terms of the CBA.   While Hibbing Taconite was free to articulate its view of those terms, questions concerning the permissible parameters of its drug testing policy – and, in particular, the question of what constitutes "reasonable suspicion" – remain dependent on the parameters set by the CBA.   Consequently, Thompson's allegation that Hibbing Taconite failed to follow its own drug testing policies is inextricably interwoven with the terms of the CBA and is completely preempted by the LMRA.[2]

## B.    Count II

While the Court's conclusion as to Count I is sufficient for this Court to exercise jurisdiction over this action, *see Gaming Corp.*, 88 F.3d at 543, the Court notes that Thompson's additional claims would provide a basis for jurisdiction as well.   In Count II, Thompson alleges common law invasion of privacy.   This claim arises under Minnesota state law.   However, as with Count I, Thompson bases this claim in part on Hibbing Taconite's violation of its own testing policies.   For the reasons set forth above, any analysis of Hibbing Taconite's conformity with those policies would require interpretation of the CBA.   *See also Gore v. Trans World Airlines*, 210 F.3d 944, 951 (8th Cir. 2000) (finding an invasion of privacy claim preempted under the analogous RLA

---

[2] Moreover, any argument that Hibbing Taconite made an agreement that was separate from the CBA may itself implicate the CBA, because the CBA limits Hibbing Taconite's ability to set conditions of employment without bargaining with the Union.   (See Kern Aff. Ex. A, at § 2.)

where the applicable rights and duties were created by the CBA). Accordingly, Thompson's invasion of privacy claim is completely preempted as well.

### C.     Count III

In Count III, Thompson brings a claim for breach of contract. As with Counts I and II, this claim is ultimately based on Hibbing Taconite's alleged failure to follow its testing policies. For the reasons set forth above, the Court concludes that such a claim is interwoven with the CBA, and is also a sufficient basis for this Court's jurisdiction.

### D.     Count IV

Finally, in Count IV, Thompson brings a claim for defamation. In short, he argues that Hibbing Taconite informed him he was being fired because of positive drug tests and that he was forced to "re-publish" this defamatory information when prospective employers asked him why he was fired. *See Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 886-88 (Minn. 1986) (recognizing this type of "compelled" defamation claim). Hibbing Taconite, however, has asserted that its statements were shielded by a qualified privilege. (*See* Joint Answer at ¶10.) Hibbing Taconite bases this defense on the language of the CBA, which it believes required it to inform Thompson of the reason for his termination. (*See, e.g.*, Kern Aff. Ex. A, at § XII (setting forth CBA procedures for adjudicating grievances, which require some communication as to the details of the dispute).) Because resolving this dispute would require interpretation of the relevant CBA provisions governing employer disclosures, it is also preempted, and is a further basis for this Court's jurisdiction. *See Lavela v. S.B. Foot Tanning Co.*, No. 03-

4115, 2005 WL 1430302, at *9 (D. Minn. Mar. 7, 2005) (finding a defamation claim preempted where the disclosure of a reason for termination was "an integral part of the grievance process"); *cf. Luecke v. Schnucks Markets, Inc.*, 85 F.3d 356, 360 (8th Cir. 1996) (concluding that a defamation claim was not preempted where the communications at issue were directly to third parties and were not allegedly required under the CBA).

In sum, while it is conceivable that an employee in Thompson's position could have drafted a complaint based entirely on state law, he has not done so here. Each of the four claims addressed above contain allegations that are interwoven with the CBA, and are thus preempted under the LMRA. Accordingly, the Court has federal subject matter jurisdiction over this action, and Thompson's motion for remand is denied.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Thompson's Motion for Remand [Docket No. 5] is **DENIED**.

DATED:  October 24, 2008
at Minneapolis, Minnesota.

           s/ John N. Tunheim
                  JOHN R. TUNHEIM
            United States District Judge